UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
INGRID LEMME,

                              Plaintiff,          **MEMORANDUM OF DECISION
                                                   AND ORDER**
                                                  04-CV-2501 (DRH) (WDW)

              - against -

NATIONAL BROADCASTING COMPANY,
INC.,

                              Defendant.
----------------------------------------------------------X
**A P P E A R A N C E S :**

Attorneys for Plaintiff:
**EDWARD J. MARTZ, ESQ.**
Post Office Box 2012
Montauk, New York 11954

Attorneys for Defendant**:**
**NBC UNIVERSAL, INC.**
**ELISABETH C. YAP, ESQ.**
30 Rockefeller Plaza, Room 1092E
New York, New York 10112

**HURLEY, District Judge:**

          Plaintiff Ingrid Lemme ("Plaintiff") filed the present action against defendant

National Broadcasting Company, Inc. ("Defendant" or "NBC"), claiming that Defendant's

television show "American Dreams" infringes upon Plaintiff's trademark "American Dream."

Defendant has moved for summary judgment pursuant to Federal Rule of Civil Procedure

("Rule") 56.  For the reasons that follow, Defendant's motion is granted and this case is

dismissed in its entirety.

*BACKGROUND*

          The material facts, drawn from the Complaint and the parties' Local 56.1

Statements, are undisputed unless otherwise noted.

Plaintiff, an immigrant from Germany, is the host of a half-hour talk show entitled "American Dream" that is broadcast on WVVH Hamptons Television, a local cable station. The show is also known as "The American Dream Show" and began airing in 1997. According to the show's website, the show "demonstrat[es] the American Dream by emphasizing . . . family heritage, struggles, goals, dreams and accomplishments." (Def.'s Ex. A.) The show started as a chronicle of immigrants' success stories but later broadened to cover anyone with humble beginnings who "made it big." (Def.'s Ex. E.) The show's introduction features a waving American flag, and the theme song declares: "We followed hope and its golden gleam . . . across the oceans til we found the American dream." (Def.'s Ex. D.)

Plaintiff claims that her show is "seen in the Northeast market generally and specifically New York, Connecticut and Rhode Island." (Pl.'s Aff. in Opp'n, dated Aug. 8, 2005 ("Pl.'s Aff.") ¶ 2.) She also states that the show is seen "world-wide" on the internet. (*Id.*; *see also* Def.'s Ex. H, Hamptons TV Goes Online, New York Newsday (Mar. 25, 2004) ("WVVH-TV, which up until this week could only be viewed on the East End, started broadcasting its programming on the Web on Tuesday.").)

In September 2002, NBC debuted a one-hour fictional drama entitled "American Dreams" in conjunction with Dick Clark and Universal Television. The show is set in Philadelphia and centers around the experience of the fictional Pryor family during the 1960s. The teenage daughter dances on "American Bandstand" and each episode features musical performances by contemporary musicians that are integrated with clips from "American Bandstand."

NBC began promoting American Dreams in May 2002. The show was broadcast nationally on NBC, reaching millions of viewers. In 2005, the show was canceled and the last episode aired in April 2005. According to Defendant, NBC plans to continue distributing the show in syndication and on DVD.

Prior to launching American Dreams, NBC conducted a title and trademark search. The results of that search are submitted in a document dated May 10, 2002 which is entitled "Title Report – AMERICAN DREAMS." (Def.'s Ex. M.) The search revealed that on December 18, 1997, Plaintiff applied to register the trademark "AMERICAN DREAM" with the United States Patent and Trademark Office ("USPTO") for a television talk show dealing with topics relating to immigrants. (Def.'s Ex. JJ.) On April 16, 1999, Plaintiff's application was rejected as abandoned. The report also showed numerous television shows and other works that have titles incorporating "American dream."

On July 29, 2002, *after* NBC began promoting its show, Plaintiff filed another application with the USPTO, which was granted on March 25, 2003. (Def.'s Ex. CC.) Pursuant thereto, Plaintiff registered "AMERICAN DREAM" as a service mark for "ENTERTAINMENT SERVICES IN THE NATURE OF AN ONGOING TELEVISION PROGRAM IN THE FIELD OF A TALK SHOW DEALING WITH THE LIVES OF PEOPLE." (*Id.*)

On June 17, 2004, Plaintiff commenced the instant lawsuit. Essentially, Plaintiff claims that Defendant's unauthorized use of Plaintiff's federally registered trademark "American Dream" constitutes trademark infringement under the Lanham Act. Plaintiff asserts multiple claims under the Lanham Act as well as several state law claims.

On consent of both parties, Defendant moved for summary judgment pre-

discovery (*see* docket entry 11) and discovery was stayed pending this Court's decision on the

motion (*see* Feb. 17, 2005 Order).  For the reasons stated below, Defendant's motion is granted.

**DISCUSSION**

**I.**     *Applicable Law and Legal Standards*

    **A.**     *Rule 56(f)*

       Although Defendant's motion, which is labeled as a motion for summary

judgment, was filed pre-discovery, both parties filed Local Rule 56.1 Statements[1] and various

affidavits and exhibits.  In opposition to the motion, Plaintiff repeatedly asserts that there are

questions of fact precluding summary judgment; not once, however, does she allude to a need for

discovery to support her claims.  Even if she had, such bald assertion would have been

insufficient to preclude summary judgment.  The Second Circuit has instructed that:

> [A] party resisting summary judgment on the ground that it needs
> discovery in order to defeat the motion must submit an affidavit
> showing (1) what facts are sought [to resist the motion] and how
> they are to be obtained, (2) how those facts are reasonably
> expected to create a genuine issue of material fact, (3) what effort
> affiant has made to obtain them, and (4) why the affiant was
> unsuccessful in those efforts.

*Gurary v. Winehouse*, 190 F.3d 37, 43 (2d Cir. 1999) (citations and internal quotation marks

omitted).  Mere references to the lack of discovery are insufficient to satisfy this test.  *Id.*  Here,

Plaintiff did not even hint at a need for discovery much less submit the required affidavit.

Accordingly, the Court proceeds to a discussion of the merits of Defendant's motion.

---

[1] Notably, Plaintiff's Local Rule 56.1 Statement contains no citations to the record, as is required, and fails to specifically controvert many of Defendant's assertions.

**B.** *Summary Judgment*

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits

supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court considering a summary judgment motion must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions. *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim. *Id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not 'implausible.' " *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587).

## II.     *Trademark Infringement*

To prevail on a claim of trademark infringement, a plaintiff must show that she "has a valid mark entitled to protection under the Lanham Act" and that defendant's use of that mark is likely to cause confusion. *1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 407 (2d Cir. 2005). Defendant argues that Plaintiff's claim must fail because she cannot establish as a matter of law that she has a valid mark and because she has failed to present a genuine issue of material fact as to the likelihood of confusion. Because the Court agrees that based on the present record, there are no genuine issues of material fact as to the likelihood of confusion, Defendant's motion is granted.

**A.**     *Validity of Plaintiff's Mark*

**1.**     *Classification of a Mark Generally*

The validity of a mark, to a certain extent, depends upon its position along the so-called spectrum of distinctiveness.  Courts classify a mark in one of four categories in ascending order of inherent distinctiveness: generic, descriptive, suggestive, and arbitrary.  *See Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 384-85 (2d Cir. 2005); *see also Brennan's Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 131 (2d Cir. 2004).  The different categories of inherent distinctiveness have been described as follows:

> A generic term refers . . . to the genus of which the particular product is a species, e.g., "Encyclopedia," and is not entitled to trademark registration or legal protection. A descriptive mark is one which conveys an immediate idea of the ingredients, qualities or characteristics of the goods, e.g., "World Book" for an encyclopedia.  A suggestive mark is one that require[s] imagination, thought and perception to reach a conclusion as to the nature of the goods, e.g., Coppertone for suntan oil.  An arbitrary or fanciful mark is one that has no association with the particular product or service, e.g., "Kodak" for photographic equipment.

*Windsor, Inc. v. Intravco Travel Ctrs., Inc.*, 799 F. Supp 1513, 1522 (S.D.N.Y. 1992) (internal quotation marks and citations omitted).

**a.**     *Generic Marks*

Generic marks consist of "words identifying the relevant category of goods or services."  *Star Indus.*, 412 F.3d at 385;  *see also Playtex Prods., Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 163 (2d Cir. 2004) ("[G]eneric marks [are] those consisting of words that identify the type or species of goods or services to which they apply, and that are totally lacking in distinctive quality.") (citation and internal quotation marks omitted).  In other words, "a mark is generic if, in the mind of the purchasing public it does not distinguish products on the basis of

source but rather refers to the type of product," *Courtenay Commc'ns. Corp. v. Hall*, 334 F.3d 210, 214 n.2 (2d Cir. 2003), e.g., "Magazine" as a magazine title, *Time, Inc. v. Petersen Pub. Co. L.L.C.*, 173 F.3d 113, 118 (2d Cir. 1999). Generic marks "are not at all distinctive and thus are not protectable under any circumstances." *Star Indus.*, 412 F.3d at 385; *see also TCPIP Holding Co., Inc. v. Haar Commc'ns., Inc.*, 244 F.3d 88, 93 (2d Cir. 2001) ("[Generic marks] are not entitled to any protection against infringement, even if they have become famous as marks, because according such protection would deprive competitors of the right to refer to their goods by name.").[2]

Generic terms are not limited to nouns that directly name a product; instead, they may also be adjectives which name some distinctive characteristic of a genus of products. *See* 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 12:10 at 12-24 (4th ed 2006) (hereinafter referred to as *McCarthy on Trademarks*); *see also Horizon Mills Corp. v. QVC, Inc.*, 161 F. Supp. 2d 208, 213 (S.D.N.Y. 2001). For example, the Seventh Circuit found "Light Beer" and "Lite Beer" to be generic names for a type of beer light in body or taste or low in alcoholic or caloric content. *See Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75, 79-81 (7th Cir. 1977). Another example of an adjective found to be generic is "matchbox" for a type of toy car. *See J. Kohnstam, Ltd. v. Louis Marx & Co.*, 280 F.2d 437 (C.C.P.A. 1960). In this regard, "[t]he Trademark Board has said that a term which does not directly name a product but names the most important purpose of the product is a type of 'generic adjective'

_____

[2] It is well established that a word may be generic of some things but not of others. *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 147 (2d Cir. 1997). "To take a familiar example, 'Ivory' would be generic when used to describe a product made from the tusks of elephants but arbitrary as applied to soap." *Id.* (citation and internal quotation marks omitted).

8

which is a generic name." *McCarthy on Trademarks* § 12:10 at 12-24.

  **b.**  *Descriptive Marks*

  "Descriptive marks are those consisting of words identifying qualities of the product." *Id.* "A mark is descriptive if it describes the product's features, qualities, or ingredients in ordinary language or describes the use to which the product is put." *Lane Capital Mgm't, Inc. v. Lane Capital Mgm't, Inc.*, 192 F.3d 337, 344 (2d Cir. 1999); *see also Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 404 n.7 (6th Cir. 2002) ("A 'merely descriptive' mark, as opposed to a 'common descriptive' [generic] one, is often said to identify a characteristic of the thing. It is very similar to an adjective."); *Horizon Mills Corp.,* 161 F. Supp. 2d at 212 ("Descriptive terms are those that describe a thing, or 'how it is,' rather than name that thing, or 'what it is.'") (citation omitted).

  Descriptive marks are not inherently distinctive, but are protectable when they acquire "secondary meaning," *Star Indus.*, 412 F.2d at 385, i.e., they identify the source of the product rather than the product itself, *Bristol-Myers Squibb Co.* v. *McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1041 (2d Cir. 1992); *see also Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 762 n.9 (3d Cir. 2005) ("To acquire a secondary meaning in the minds of the buying public, an article of merchandise when shown to a prospective customer must prompt the affirmation, 'That is the article I want because I know its source,' and not the negative inquiry as to 'Who makes that article?'") (quoting *Esercizio v. Roberts,* 944 F.2d 1235, 1239 (6th Cir. 1991)).

  **c.**  *Suggestive Marks*

  Suggestive marks are inherently distinctive. *Star Indus.*, 412 F.3d at 385; *see also TCPIP Holding*, 244 F.3d at 94 ("Marks that do not directly describe goods or services or their

attributes, but rather are suggestive of them, have some distinctive quality and are thus protected without need to prove secondary meaning.").  "Suggestive marks are those that are not directly descriptive, but do suggest a quality or qualities of the product, through the use of imagination, thought and perception." *Star Indus.*, 412 F.3d at 385 (citation and internal quotations marks omitted); *see also Streetwise Maps, Inc. v. VanDam, Inc.,* 159 F.3d 739, 744 (2d Cir. 1998) ("The district court ranked the Streetwise mark as suggestive, meaning that the term 'suggested' the features of the product [i.e., a map] and required the purchaser to use his or her imagination to figure out the nature of the product. We agree.").

### d.       *Arbitrary and Fanciful Marks*

"Arbitrary or fanciful marks are ones that do not communicate any information about the product either directly or by suggestion." *Star Indus.*, 412 F.3d at 385.  Arbitrary means that the ordinary meaning of the word is applied in an arbitrary and non-descriptive sense. *McCarthy on Trademarks* § 11:11 at 11-18.   For example, "IVORY" soap is not made of ivory. *See id.*  "A fanciful mark is a name that is made-up to identify the trademark owner's product like EXXON for oil products and KODAK for photography products." *Gruner + Jahr*, 991 F.2d at 1075-76.  Both arbitrary and fanciful terms are always entitled to trademark protection. *Id.* at 1075.

### 2.       *Classification of Plaintiff's Mark*

#### a.       *Presumption of Validity*

As a preliminary matter, the Court notes that the fact that the USPTO accepted Plaintiff's mark for registration creates a presumption that the mark is valid. *See Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 114 (2d Cir. 2001) (citing 15 U.S.C. § 1057(b) ("A

certificate of registration of a mark upon the principal register provided by this chapter shall be prima facie evidence of the validity of the registered mark . . . .")); *see also Lane Capital Mgm't,* 192 F.3d at 345 ("Registration by the PTO without proof of secondary meaning creates the presumption that the mark is more than merely descriptive, and, thus, that the mark is inherently distinctive. As a result, when a plaintiff sues for infringement of its registered mark, the defendant bears the burden to rebut the presumption of mark's protectability by a preponderance of the evidence.") (citation omitted).

On this summary judgment motion, Defendant argues that Plaintiff's "American Dream" mark is invalid because it is merely generic. Alternatively, Defendant asserts that Plaintiff's mark is descriptive but lacks secondary meaning. The Court must presume Plaintiff's mark is valid because it has been federally registered since 2003. Such registration constitutes prima facie evidence of Plaintiff's right to use the name "American Dream" to refer to its talk show dealing with people's lives. (Def.'s Ex. CC.) The burden of production therefore shifts to Defendant to proffer evidence that the mark is not valid, i.e., that it is generic or descriptive with no secondary meaning. For the reasons stated below, the Court finds that Defendant has failed to do so.[3]

### b. *Plaintiff's "American Dream" Mark is Not Generic*

"The classification of a mark is a factual question [which turns on] how the purchasing public views the mark." *Lane Capital Mgm't,* 192 F.3d at 344; *see also Courtenay,*

---

[3] Neither party addresses whether the presumption begins at the time Plaintiff filed her application for registration, June 29, 2002, or on the date of registration, March 25, 2003. NBC's alleged infringing conduct began in May 2002 and presumably continues today via syndication and DVD rentals/sales. In either case, the applicable date does not affect the Court's conclusion that Plaintiff's mark is suggestive.

334 F.3d at 215.  Nonetheless, summary judgment is as appropriate in trademark cases as any other where there are no material disputes of fact.  *See Ideal World Mktg., Inc. v. Duracell, Inc.*, 15 F. Supp. 2d 239, 242-43 (E.D.N.Y. 1998) (citing *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 478 (2d Cir. 1996).[4]

Guided by the foregoing authority, the Court concludes that Plaintiff's mark "American Dream" is not generic.  A generic mark is entitled to no protection because to do so would "deprive competing manufactures of the product of the right to call an article by its name."  *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976).  Here, these concerns are not implicated as "American Dream" is not a generic designation for a television show.  In fact, the mark "American Dream" makes no reference whatsoever to the nature of the goods it designates.  Simply put, the phrase, without more, does not imply a television talk show dealing with people's lives.  *See Playtex Prods., Inc.*, 390 F.3d at 164 (holding that "Wet Ones" is suggestive and stating: "Wet Ones, like Wite-Out, could plausibly describe a wide variety of products."); *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 144 (2d Cir. 1997) ("In order to become generic the *principal* significance of the word must be its indication of the nature or class of an article, rather than an indication of its origin.") (citation and internal quotations marks omitted); *cf. Reese Publ'g. Co. v. Hampton Int'l Commc'ns., Inc.*, 620 F.2d 7 (2d Cir. 1980) (finding "Video Buyers Guide" to be generic).

---

[4] As stated by Defendant, "the case law is replete with cases determining on summary judgment each of the grounds for dismissal at issue here: (1) genericness, (2) lack of secondary meaning, and (3) lack of likelihood of confusion."  (Def.'s Reply at 2 (citations omitted).)

### c. *Plaintiff's "American Dream" Mark is Suggestive*

Having found that the mark is not generic, the next question becomes whether the term "American Dream" is descriptive or suggestive of the television show.[5]  Neither party addresses this issue.  Defendant's brief presumes that the term is either generic or descriptive (with no secondary meaning) and thus not entitled to any protection.  Plaintiff merely proclaims that her mark is "distinctive" and relies almost entirely on her trademark registration by the USPTO to support her claim.  Other than emphasizing registration, Plaintiff's 12-page brief is a mere recitation of a singular theme -- that classification of her mark is a question of fact.  But this oft-repeated mantra, absent any in depth analysis or citation to relevant case law, does not assist the Court in making its determination.

The descriptive-suggestive distinction is "hardly a clear one."  *McCarthy on Trademarks* § 11:66 at 11-127.  The Second Circuit has articulated the following guidelines to assist courts in making this distinction:

> A term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of goods. . . .  A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods.
>
> . . . .
>
> An illuminating explanation of the difference between a descriptive mark that conveys an idea of the characteristics of the product and a suggestive one that requires imagination to divine the nature of the product is that if there is an imaginative factor connecting the name and the product; [if] one suggests the other, but without describing it, then the name is suggestive.

---

[5]  Clearly the mark is not arbitrary or fanciful and neither party argues as much.

*Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 73-74 (2d Cir. 1988) (citations and internal

quotation marks omitted); *see also Bernard v. Commerce Drug Co.*, 964 F.2d 1338, 1341 (2d

Cir. 1992) (same); *McCarthy on Trademarks* § 11:19 at 11-30 ("To be characterized as

'descriptive,' a term must directly give some reasonably accurate or tolerably distinct knowledge

of the characteristics of a product.  If information about this product or service given by the term

used as a mark is indirect or vague, then this indicates that the term is being used in a

'suggestive,' not descriptive, manner.").

       Applying these principles to the case at bar, the Court concludes that "American

Dream" is suggestive in that a consumer would not immediately connect "American Dream"

with "a Talk Show about People, their Heritage, Goals, Struggles and Dreams."  *See*

www.americandream.com; *see also McCarthy on Trademarks* § 11:67 at 11-129-11-130 ("If the

mental leap between the word and the product's attributes is not almost instantaneous, this

strongly indicates suggestiveness, not direct descriptiveness.").  In urging the Court that the term

is merely descriptive, Defendant submits multiple dictionary definitions of "American Dream"

which it claims supports its view that the public's perception of the term is uniform.  (Def.'s Ex.

S.)  Examples include: (1) "an American ideal of a happy and successful life to which all may

aspire" (The American Heritage Dictionary of the English Language 15 (4th ed. 2000)); (2) "an

American social ideal that stresses egalitarianism and esp. material prosperity" (Merriam-

Webster's Collegiate Dictionary 37 (10th ed. 1994)); (3) "the traditional social ideals of the

United States, such as equality, democracy, and material prosperity" (The New Oxford American

Dictionary 50 (2001)); (4) "the ideals of freedom, equality, and opportunity traditionally held to

be available to every American" (Webster's Encyclopedic Unabridged Dictionary of the English

Language 66 (1996)).

In the Court's view, these definitions are not sufficiently consistent so as to suggest that an ordinary consumer confronted with the term "American Dream" would immediately sense the identical thing, much less perceive the characteristics of Plaintiff's show. In fact, one of the very definitions proffered by Defendant demonstrates the term's ambiguity: "[t]he American dream *is almost impossible to define, meaning as it does so many different things to so many different people*. These words go back at least to de Tocqueville's *Democracy in America* (1835) and are usually associated with the dreams of people new to these shores of freedom, material prosperity, and hope for the future." (The Facts on File Encyclopedia of Word and Phrase Origins (1987) at 15 (attached as Def.'s Ex. S) (emphasis added).)

This conclusion is further borne out by Defendant's proffer regarding the multitude of motion pictures, books, television shows, and other services and goods which have used "American dream" in their titles. Although Defendant argues that these works demonstrate that "[t]here is a longstanding and expansive genre of works about the broad American social ideal of success known as the 'American dream'" (Def.'s Mem. at 8), a review of the few descriptions offered reveals the great divergence among the works' contents. For example, one television show entitled "AMERICAN DREAM" that aired in 1981 is described as "a contemporary drama about a family who leaves the suburbs and undergoes a cultural shock when they move into a Chicago neighborhood." (Def.'s Ex. Y ("Title Report") at 3.) Another work is labeled a "[t]elefeature" which aired in 1981 about "members of a young midwestern family who leap onto an adventure that changes their lives." (*Id.*) Yet another is a motion picture entitled "AMERICAN DREAM" produced in 1996 about "a sensation-seeking televison reporter, who

15

has been needling police about their connections with [the] underworld [and] accidentally murders his estranged wife and now finds not only the underworld wanting him dead, but the police try to get him on a murder charge." (*Id.* at 2.)

Even assuming arguendo that the term "American Dream" conjured up general, and even somewhat related, ideals in the minds of an average consumer pertaining to success in America, the term does not sufficiently describe the "particular [show] itself or its differentiating qualities." *See Hasbro*, 858 F.2d at 75 (finding that term "GUNG-HO" was suggestive rather than descriptive of a toy action figure of a marine sergeant because "a certain amount of creative imagination is required" of the child to intuit the specific attributes of this particular character from its mark.); *see also Twin Peaks Prods., Inc. v. Publ'ns Int'l Ltd.*, 996 F.2d 1366, 1379 n.4 (2d Cir. 1993) ("The TWIN PEAKS mark is at least suggestive and not merely descriptive. TWIN PEAKS neither literally describes the television program nor describes the purpose or utility of the product."); *Playboy Enters., Inc. v. Chuckleberry Publ'g, Inc.*, 687 F.2d 563, 566-67 (2d Cir. 1982) (holding that term "PLAYBOY" was suggestive; although term "may signify the aspirations of PLAYBOY's readership, it does not describe the product or its contents"). Rather, connecting general ideals of prosperity to a talk show where guests are invited to talk about "family heritage, struggles, goals, dreams and accomplishments" (Def.'s Ex. A) requires some imagination and "it is this need to resort to imagination that renders ["American Dream"] suggestive rather than descriptive." *Hasbro*, 858 F.2d at 75. Thus, based on the undisputed facts before the Court, the Court holds that "American Dream" as used by Plaintiff in relation to her

television show is a suggestive mark.[6]

### III.    *Likelihood of Confusion*

#### A.    *Literary Titles*

Having decided that Plaintiff's mark is suggestive, it would ordinarily follow that it is protectable without proof of secondary meaning.  *See Hasbro*, 858 F.2d at 75.  However, "[b]ecause of an author's significant First Amendment interest in choosing an appropriate title for his or her work," the Second Circuit has applied a more stringent rule to literary titles, such as the name of Plaintiff's television show.  *Twin Peaks Prods.*, 996 F.3d at 1379.  While the Second Circuit has not yet decided whether a showing of secondary meaning is required for literary titles, *id.*, it has held that "literary titles do not violate the Lanham Act 'unless the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work.'"  *Id.* (quoting *Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir. 1989)).

Here, neither party has suggested that "American Dreams" is of no relevance to Defendant's show.  The question then is whether the title "explicitly misleads as to the source or content of the work."  *Id.*  This determination is made, in the first instance, by application of "the venerable *Polaroid* factors."  *Id.* (referencing *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961)).  However, "the finding of likelihood of confusion must be particularly compelling to outweigh [Defendant's significant] First Amendment interest."  *Id.*; *see also*

---

[6]  Because, as discussed *infra*, the Court finds that a reasonable trier of fact could not find for Plaintiff on the likelihood of confusion element, the Court grants Defendant's motion for summary judgment despite the Court's finding that Plaintiff's mark is suggestive and thus, *potentially*, entitled to protection.

*Rogers*, 875 F.3d at 999 ("The [Lanham] Act should be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression.").  Accordingly, the Court turns to the critical inquiry in this case: whether Defendant's use of "American Dreams" is likely to cause confusion.

**B.    *The Polaroid Factors***

"To support a finding of infringement, a *probability* of confusion, not a mere possibility, must exist." *Id.* (emphasis added); *see also Playtex Prods., Inc.*, 390 F.3d at 161.  A probability of confusion "may be found when a large number of purchasers likely will be confused as to the source of the goods in question." *Streetwise Maps, Inc.,* 159 F.3d at 743.  In determining whether or not there is a likelihood of confusion, courts in the Second Circuit apply the eight factors set forth by Judge Friendly in the *Polaroid* decision:

> (1) the strength of plaintiff's mark; (2) the similarity of the parties' marks; (3) the proximity of the parties' products in the marketplace; (4) the likelihood that the plaintiff will "bridge the gap" between the products; (5) actual consumer confusion between the two marks; (6) the defendant's intent in adopting its mark; (7) the quality of the defendant's product; and (8) the sophistication of the relevant consumer group.

*Playtex Prods., Inc.*, 390 F.3d at 162 (quoting *Polaroid*, 287 F.2d at 495)).

"Where the predicate facts are beyond dispute, the proper balancing of these factors is considered a question of law." *Id.* (citing *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000)).  In general, no single factor should be treated as dispositive. *Id.* Furthermore, the evaluation of the *Polaroid* factors is not "a mechanical process by which the party with the greatest number of factors wins." *Id.*  "Instead, the court 'should focus on the ultimate question of whether consumers are likely to be confused.'" *Id.* (quoting *Nabisco, Inc.,*

18

220 F.3d at 46).

### 1. The Strength of the Mark

The strength of a mark refers to its distinctiveness, i.e., its tendency to identify goods sold under the mark as emanating from one particular source. *See Streetwise Maps*, 159 F.3d at 743; *Brennan's, Inc.*, 360 F.3d at 130. To determine a mark's strength, courts consider two factors: its inherent distinctiveness and its distinctiveness in the marketplace. *See Streetwise Maps*, 159 F.3d at 743; *Brennan's, Inc.*, 360 F.3d at 130-31.

"[I]nherent distinctiveness[] examines a mark's theoretical potential to identify plaintiff's goods or services without regard to whether it has actually done so." *Id.* at 131. As discussed above, courts classify a mark in one of four categories in ascending order of inherent distinctiveness: generic, descriptive, suggestive, and arbitrary. *See Streetwise Maps*, 159 F.3d at 744; *Brennan's, Inc.*, 360 F.3d at 131. Here, the Court has already found that Plaintiff's mark is suggestive and therefore falls into the second highest ranking category of distinctiveness. Accordingly, the Court proceeds to consider Plaintiff's mark's distinctiveness in the marketplace. *See Streetwise Maps*, 159 F.3d at 744 ("Suggestiveness, however, does not necessarily determine the issue regarding the strength of the mark. [The Court] must still consider the mark's distinctiveness in the marketplace.").

Distinctiveness in the marketplace "looks solely to that recognition plaintiff's mark has earned in the marketplace as a designator of plaintiff's goods or services." *Brennan's Inc.*, 360 F.3d at 131. Here, other than conclusory assertions that she has expended "considerable sums on advertising to promote [her] show" and that, as a result, her "show and the marks associated with it have become distinctive and distinguish [her] and [her] show from

other businesses and TV shows" (Pl.'s Aff. ¶ 4), Plaintiff has presented no evidence that the public has come to identify "American Dream" with her show.  Defendant, on the other hand, has proffered evidence which demonstrates extensive third-party use of the term "American dream," thereby suggesting that the mark is not particularly distinctive in the marketplace.[7]  *See Streetwise Maps*, 159 F.3d at 744 (finding mark weakened by extensive use of the words "street" and "wise" in names registered by manufacturers of other products); *Lang v. Ret. Living Pub. Co., Inc.*, 949 F.2d 576, 581 (2d Cir. 1991) ("[E]xtensive third party use of the words 'Choice' and 'Choices' weighs against a finding that Lang's trade name is strong.").

In the absence of any evidence that Plaintiff's mark is distinctive in the marketplace, and in the face of Defendant's evidence that the term "American dream" is commonly used in the marketplace, the Court finds that although Plaintiff's mark is ranked as suggestive for its inherent distinctiveness, it is not strong.  Accordingly, this factor favors Defendant.

### 2.    *The Similarity of the two Marks*

"In determining whether the two marks are similar, and therefore likely to provoke confusion among prospective purchasers, courts appraise 'the overall impression created by the logos and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers.'"  *Streetwise Maps*, 159 F.2d at 744 (quoting *Gruner + Jahr*, 991 F.2d at 1078).  "Each mark must be compared against the other as a

---

[7]  For example, Defendant's title availability search revealed that over a dozen motion pictures, 50 books, 250 musical compositions, dozens of plays, stories and articles, and countless other services and goods have the term "American dream" in their titles.  (Def.'s Ex. M.)  In addition, Amazon.com lists more than 1,000 books with titles incorporating the term.  (Def.'s Ex. AA.)

whole." *Brennan's Inc.*, 360 F.3d at 133; *see also I.T.S. Industria Tessuti Speciali v. Aerfab Corp.*, 280 F. Supp. 581, 588 (S.D.N.Y. 1967) ("It is well settled that marks cannot be dissected for purposes of comparison but must be considered in their entirety."). Moreover, "[t]he fact that the two marks appear similar is not dispositive. Rather, the question is whether such similarity is more likely than not to cause consumer confusion." *Id.*

   Here, Defendant's title consists of "American" in red letters above "Dreams" in white letters, using a rounded font. Plaintiff's show uses a logo with "AMERICAN DREAM" spelled out in all capitals, red letters, with a blue star between the two words, and the words "TV SHOW" directly below, using an angular font. Among the most important differences is the fact that Defendant's program has only been shown and advertised with its distinguishing NBC logo in the bottom right corner of the screen. The Second Circuit has "repeatedly found that the presence of a distinct brand name may weigh against a finding of confusingly similarity." *Playtex Prod.*, 390 F.3d at 164 (collecting cases); *see also Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 123 (2d Cir. 2001) ("Based on the record before us, we find that the presence of the prominent and distinctive labels alone negates any possibility of a likelihood of confusion . . . ."); *Nabisco, Inc.*, 220 F.3d at 46 ("Warner-Lambert's prominent use of its well-known house brand therefore significantly reduces, if not altogether eliminates, the likelihood that consumers will be confused as to the source of the parties' products.").

   In Plaintiff's show's introduction, the title shares billing with Plaintiff's name ("American Dream TV Show with Ingrid Lemme"), the name of the show's setting ("Gurney's Inn") above it, the name of the cable network on which it airs ("WVVH") in the upper right hand corner, and an American flag waving in the background. Moreover, the "WVVH" logo remains

21

on the screen throughout the broadcast.

Given the use of different colors and typefaces, the prominent display of "NBC" with Defendant's title, and Defendant's show national distribution versus Plaintiff's local cable distribution, the Court finds that this factor favors Defendant; the marks are not so similar as to create confusion among prospective viewers.

### 3. The Proximity of the Parties' Products in the Marketplace

This factor focuses on whether the two products compete with each other. *See Streetwise Maps*, 159 F.2d at 745. As recently articulated by the Second Circuit:

> The competitive proximity factor has two elements, market proximity and geographic proximity. Market proximity asks whether the two products are in related areas of commerce and geographic proximity looks to the geographic separation of the products. Both elements seek to determine whether the two products have an overlapping client base that creates a potential for confusion.

*Brennan's*, 360 F.3d at 134. Other than her assertions as to the local television market on which her show is broadcast, and her claim that her program may be seen on the world-wide web, Plaintiff offers no evidence on this point.[8]

Without more information, the Court finds that this factor favors Defendant. A review of the record reveals that although both parties produce television programs, their shows are quite different from one another, both in substance and theme. Moreover, Plaintiff's show is broadcast locally and reaches thousands of viewers while NBC's show was broadcast nationally and reached millions of viewers. Given the differences between the two shows, their

---

[8] Plaintiff submits an article which she states is "from Germany in 2000 discussing the success of [her] show." (Pl.'s Aff. ¶ 2.) Because the article is written in German and Plaintiff offers no translation, the Court declines to consider it.

"geographic separation," and the absence of any evidence demonstrating "an overlapping client base that creates a potential for confusion," the Court finds that this factor fails to give rise to a question of fact regarding the likelihood of consumer confusion.[9]

### 4.      *The Likelihood that Plaintiff will "Bridge the Gap"*

The question under this factor is the likelihood that Plaintiff will enter Defendant's market.  *W.W.W. Pharmaceutical v. Gillette Co.*, 984 F.2d 567, 574 (2d Cir. 1993), *superceded on other grounds*, *Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39 (2d Cir. 1994). "This factor is designed to protect the senior user's 'interest in being able to enter a related field at some future time. . . ." *Id.* (quoting *Scarves by Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167, 1172 (2d Cir. 1976)).

In her affidavit, Plaintiff asserts that "[a]s [her] show gained acceptance and market share [she] began to receive interest about taking it to a national level."  (Pl.'s Aff. ¶ 6.) Consequently, she submitted a "business plan and budget . . . to various networks, including A&E, PBS, and TBS."  (*Id.* ¶ 7.)  According to Plaintiff, her "proposal was received enthusiastically and [she] began negotiations with several parties to expand and syndicate [her] show."  (*Id.* ¶ 9.)  "After NBC aired its show, all negotiations to develop [her] show with other parties ceased."  (*Id.*)  Plaintiff submits a signed unsworn letter from the President and General Manager of WVVH television who states that "after NBC began to air its American Dream show, the potential of [Plaintiff's] show was greatly diminished due to confusion with the arrival

---

[9]  Although there is some geographic overlap between the two shows as NBC's show was distributed nationally and thus encompassed the area where Plaintiff's show is broadcast, the overlap is minimal.  Moreover, there has been no showing that there was an overlap in client base that created a potential for confusion.

of the NBC's show with the same name." (Ex. to Pl.'s Aff.) She also submits the signed

unsworn statement of the producer of her show to the same effect. (*Id.*)

Viewing Plaintiff's affidavit favorably,[10] it presents some evidence that Plaintiff

was intending to bridge the gap between her locally viewed show and Defendant's nationally

broadcast show. However, she has presented no evidence that she planned on bridging the gap

with respect to the very different nature of the parties' programming. Nonetheless, the Court

finds that this factor weighs at most weakly in favor of a finding of confusion.

### 5. *Actual Consumer Confusion Between the Two Marks*

"It is self-evident that the existence of actual consumer confusion indicates a

likelihood of consumer confusion." *Virgin Enters. Ltd. v. Nawas*, 335 F.3d 141, 151 (2d Cir.

2003). It is well established, however, that a plaintiff seeking to prevail under the Lanham Act

need not prove the existence of actual confusion, "since actual confusion is very difficult to

prove and the Act requires only a likelihood of confusion." *Lois Sportswear, U.S.A., Inc. v. Levi*

*Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986).

In support of her claim of actual confusion, Plaintiff submits copies of three e-

mails she allegedly received. One e-mail is from a "Mary Hughes" who writes "They are using

your trade marked name call your lawyer." (Ex. to Pl.'s Aff.) The next e-mail is from a "Roy

Bradbrook" who writes: "Ingrid, saw the other American dream show[.] I am not a lawyer –

---

[10] Because both the letter and statement proffered by Plaintiff are unsworn, they are inadmissible and thus may not be considered by the Court. *See United States v. All Right,Title & Interest in Real Prop. & Appurtenances*, 77 F.3d 648, 657-58 (2d Cir. 1996) ("The submission of [an] unsworn letter was an inappropriate response to the . . . motion for summary judgment, and the factual assertions made in that letter were properly disregarded by the court."). In any event, even were the Court to consider these submissions, the result would be the same.

these names are trademarked by you, surely you have a legal right to get them to stop using the names or [] to receive damages for infringement. Big corporations should not be above the law."

(*Id.*)

> The final e-mail is from "MidnightPassInc@aol.com" who writes:
>
>> I am looking forward to our May show date showing American Flag Hammocks. . . . <u>Also, please clarify this for me. I understand that your show is American Dream and I saw a show last week called American Dreams on NBC. I am confused. . ? Who are they and who are you? I thought you were the originator of this type of program</u>? I might suggest that you check the Patent and Trademark Office a . . . and verify if NBC is infringing on your established and registered trademark. . . .

(*Id.* (emphasis in original).

> To the extent these e-mails demonstrate that the authors knew of the existence of NBC's show as separate and distinct from Plaintiff's show, they evidence consumer knowledge, not confusion. *See Nora Beverages*, 269 F.3d at 124 ("Inquiries about the relationship between an owner of a mark and an alleged infringer do not amount to actual confusion. Indeed, such inquiries are arguably premised upon a *lack* of confusion between the products such as to inspire the inquiry itself."). Moreover, insofar as the last e-mail suggests that the author is confused, this one instance, standing alone, is insufficient to create a genuine issue of material fact as to the likelihood of confusion. *See id.* ("[T]wo anecdotes of confusion over the entire course of competition constituted *de minimis* evidence insufficient to raise triable issues."). Accordingly, the absence of proof of any actual confusion, although not dispositive, is a factor favoring Defendant. *See Windsor, Inc.*, 799 F. Supp. at 1524 ("Although no evidence of actual confusion is necessary to prove a likelihood of confusion, the court may infer from the lack of such evidence that consumer confusion is unlikely to occur.").

### 6. *Defendant's Intent in Adopting its Mark*

This factor examines whether defendant "adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between [defendant's] and [plaintiff's] product." *Lang*, 949 F.2d at 583; *see also Streetwise Maps*, 159 F.3d at 745. Plaintiff argues that the Court may infer Defendant's bad faith based on the fact that both the date accepted by the USPTO as Plaintiff's first use of the term "AMERICAN DREAM," viz. December 1997, and the date Plaintiff filed its application for registration with the USPTO, viz. July 29, 2002, precede NBC's launching of its "American Dreams" program. Plaintiff is mistaken.

As an initial matter, the Court notes that prior knowledge of Plaintiff's mark, without more, does not create an inference of bad faith. *See Playtex Prods., Inc.*, 390 F.3d at 166; *cf. Lang*, 949 F.2d at 584 ("[A]doption of a trademark with actual knowledge of another's prior registration of a very similar mark may be consistent with good faith."). In any event, the undisputable evidence reveals that NBC conducted its title search and began using its title in May 2002, prior to Plaintiff's filing for registration in July 2002, and prior to actual registration, which occurred in 2003. Thus, NBC could not have had notice of Plaintiff's registration, or of her filing, prior to its use of the title "American Dreams" because its use preceded both dates. Further, there is no evidence to even suggest that NBC was aware of Plaintiff's show at all prior to launching its own program. In fact, NBC contends otherwise.

"Good faith can be found if a defendant has selected a mark which reflects the product's characteristics, has requested a trademark search or has relied on the advice of counsel." *See W.W.W. Pharmaceutical Co.*, 984 F.3d at 575. Given the extensive title and

trademark search conducted by NBC prior to using its title, the fact that the title of NBC's

program reflects certain characteristics of the show, and the failure of Plaintiff to elicit any facts

which would suggest Defendant's bad faith, the Court finds that this factor favors Defendant.

### 7.      *The Quality of Defendant's Product*

"'This factor is primarily concerned with whether the senior user's reputation

could be jeopardized by virtue of the fact that the junior user's product is of inferior quality.'"

*The Sports Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 965 (2d Cir. 1996) (quoting

*Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 398 (2d Cir. 1995)).  Plaintiff does not

dispute that NBC's nationally broadcast show "is vastly superior in quality" to Plaintiff's local

talk show.  Therefore, this factor clearly favors Defendant.

### 8.      *The Sophistication of the Relevant Consumer Group*

Generally, the more sophisticated a consumer, the more attention and care given

to selecting a product; thus, unsophisticated buyers are more likely to be confused and

sophisticated buyers are less likely to be so.  *See, e.g.*, *W.W.W. Pharmaceutical,* 984 F.2d at 575-

76; *WE Media, Inc. v. General Elec. Co.*, 218 F. Supp. 2d 463, 479 (S.D.N.Y. 2002).  There is no

evidence in the record as to the sophistication of either programs' viewers.  Thus, this factor does

not show that there is a likelihood of confusion between the marks at issue.[11]

---

[11]  Given the stark differences between the two programs, even an ordinary consumer is
unlikely to be confused.  *See Motown Prods., Inc. v. Cacomm, Inc.*, 668 F. Supp. 285, 291-92
(S.D.N.Y. 1987) ("The two programs, however, are so different in content and quality tha[t]
there is no likelihood of confusion even among ordinary television viewers. No significant
number of viewers could confuse the $10 million Motown production, featuring a well-known
comedian as host, a band under the direction of a prominent popular musician, and a variety of
entertainment, with Cacomm's $54,000 series, consisting solely of one-camera, 'talking heads'
interviews conducted by two unknowns."), *rev'd on other grounds*, 849 F.2d 781 (2d Cir. 1988).

C.      **Balancing the Factors**

Having carefully considered and weighed the eight *Polaroid* factors as well as the arguments and submissions of the parties, the Court determines as a matter of law that Plaintiff has failed to offer evidence that creates a material question of fact as to the likelihood of consumer confusion with respect to the parties' marks. No rational trier of fact could find for Plaintiff after an evaluation of the *Polaroid* factors. This is especially so in this case where the finding of likelihood of confusion must be "particularly compelling" to outweigh NBC's significant First Amendment interest in the title of its program. Accordingly, Defendant's motion for summary judgment is granted.

IV.      **Plaintiff's Remaining Claims are Dismissed**

The remaining claims in this case arise under state law. Having found that the allegations in the Complaint do not support federal jurisdiction, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims. *See* 28 U.S.C. § 1367(c)(3). Accordingly, all state law claims are dismissed without prejudice to refiling in state court.

### CONCLUSION

For all of the above reasons, Defendant's motion for summary judgment is GRANTED as to all of Plaintiff's claims, and this case is accordingly DISMISSED in its entirety. The Clerk of Court is directed to CLOSE this case.

**SO ORDERED.**

Dated: February 1, 2007
           Central Islip, New York                    /s_____
                                                                      Denis R. Hurley,
                                                                      United States District Judge

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
INGRID LEMME,

                                    Plaintiff,          **MEMORANDUM OF DECISION
                                                        AND ORDER**
                                                        04-CV-2501 (DRH) (WDW)

                - against -

NATIONAL BROADCASTING COMPANY,
INC.,

                                    Defendant.
------------------------------------------------------------X
**A P P E A R A N C E S :**

Attorneys for Plaintiff:
**EDWARD J. MARTZ, ESQ.**
Post Office Box 2012
Montauk, New York 11954

Attorneys for Defendant**:**
**NBC UNIVERSAL, INC.**
**ELISABETH C. YAP, ESQ.**
30 Rockefeller Plaza, Room 1092E
New York, New York 10112

**HURLEY, District Judge:**

            Plaintiff Ingrid Lemme ("Plaintiff") filed the present action against defendant

National Broadcasting Company, Inc. ("Defendant" or "NBC"), claiming that Defendant's

television show "American Dreams" infringes upon Plaintiff's trademark "American Dream."

Defendant has moved for summary judgment pursuant to Federal Rule of Civil Procedure

("Rule") 56.  For the reasons that follow, Defendant's motion is granted and this case is

dismissed in its entirety.

                                    *BACKGROUND*

            The material facts, drawn from the Complaint and the parties' Local 56.1

Statements, are undisputed unless otherwise noted.

Plaintiff, an immigrant from Germany, is the host of a half-hour talk show entitled "American Dream" that is broadcast on WVVH Hamptons Television, a local cable station. The show is also known as "The American Dream Show" and began airing in 1997. According to the show's website, the show "demonstrat[es] the American Dream by emphasizing . . . family heritage, struggles, goals, dreams and accomplishments." (Def.'s Ex. A.) The show started as a chronicle of immigrants' success stories but later broadened to cover anyone with humble beginnings who "made it big." (Def.'s Ex. E.) The show's introduction features a waving American flag, and the theme song declares: "We followed hope and its golden gleam . . . across the oceans til we found the American dream." (Def.'s Ex. D.)

Plaintiff claims that her show is "seen in the Northeast market generally and specifically New York, Connecticut and Rhode Island." (Pl.'s Aff. in Opp'n, dated Aug. 8, 2005 ("Pl.'s Aff.") ¶ 2.) She also states that the show is seen "world-wide" on the internet. (*Id.*; *see also* Def.'s Ex. H, Hamptons TV Goes Online, New York Newsday (Mar. 25, 2004) ("WVVH-TV, which up until this week could only be viewed on the East End, started broadcasting its programming on the Web on Tuesday.").)

In September 2002, NBC debuted a one-hour fictional drama entitled "American Dreams" in conjunction with Dick Clark and Universal Television. The show is set in Philadelphia and centers around the experience of the fictional Pryor family during the 1960s. The teenage daughter dances on "American Bandstand" and each episode features musical performances by contemporary musicians that are integrated with clips from "American Bandstand."

NBC began promoting American Dreams in May 2002. The show was broadcast nationally on NBC, reaching millions of viewers. In 2005, the show was canceled and the last episode aired in April 2005. According to Defendant, NBC plans to continue distributing the show in syndication and on DVD.

Prior to launching American Dreams, NBC conducted a title and trademark search. The results of that search are submitted in a document dated May 10, 2002 which is entitled "Title Report – AMERICAN DREAMS." (Def.'s Ex. M.) The search revealed that on December 18, 1997, Plaintiff applied to register the trademark "AMERICAN DREAM" with the United States Patent and Trademark Office ("USPTO") for a television talk show dealing with topics relating to immigrants. (Def.'s Ex. JJ.) On April 16, 1999, Plaintiff's application was rejected as abandoned. The report also showed numerous television shows and other works that have titles incorporating "American dream."

On July 29, 2002, *after* NBC began promoting its show, Plaintiff filed another application with the USPTO, which was granted on March 25, 2003. (Def.'s Ex. CC.) Pursuant thereto, Plaintiff registered "AMERICAN DREAM" as a service mark for "ENTERTAINMENT SERVICES IN THE NATURE OF AN ONGOING TELEVISION PROGRAM IN THE FIELD OF A TALK SHOW DEALING WITH THE LIVES OF PEOPLE." (*Id.*)

On June 17, 2004, Plaintiff commenced the instant lawsuit. Essentially, Plaintiff claims that Defendant's unauthorized use of Plaintiff's federally registered trademark "American Dream" constitutes trademark infringement under the Lanham Act. Plaintiff asserts multiple claims under the Lanham Act as well as several state law claims.

On consent of both parties, Defendant moved for summary judgment pre-

discovery (*see* docket entry 11) and discovery was stayed pending this Court's decision on the

motion (*see* Feb. 17, 2005 Order).  For the reasons stated below, Defendant's motion is granted.

## DISCUSSION

I.      *Applicable Law and Legal Standards*

   A.      *Rule 56(f)*

         Although Defendant's motion, which is labeled as a motion for summary

judgment, was filed pre-discovery, both parties filed Local Rule 56.1 Statements[1] and various

affidavits and exhibits.  In opposition to the motion, Plaintiff repeatedly asserts that there are

questions of fact precluding summary judgment; not once, however, does she allude to a need for

discovery to support her claims.  Even if she had, such bald assertion would have been

insufficient to preclude summary judgment.  The Second Circuit has instructed that:

> [A] party resisting summary judgment on the ground that it needs
> discovery in order to defeat the motion must submit an affidavit
> showing (1) what facts are sought [to resist the motion] and how
> they are to be obtained, (2) how those facts are reasonably
> expected to create a genuine issue of material fact, (3) what effort
> affiant has made to obtain them, and (4) why the affiant was
> unsuccessful in those efforts.

*Gurary v. Winehouse*, 190 F.3d 37, 43 (2d Cir. 1999) (citations and internal quotation marks

omitted).  Mere references to the lack of discovery are insufficient to satisfy this test.  *Id.*  Here,

Plaintiff did not even hint at a need for discovery much less submit the required affidavit.

Accordingly, the Court proceeds to a discussion of the merits of Defendant's motion.

_____

   [1] Notably, Plaintiff's Local Rule 56.1 Statement contains no citations to the record, as is
required, and fails to specifically controvert many of Defendant's assertions.

**B.**     *Summary Judgment*

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law.  *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994).  The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor.  *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried.  *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996).  The non-movant must present more than a "scintilla of evidence," *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits

supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court considering a summary judgment motion must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions. *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim. *Id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not 'implausible.' " *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587).

## II.     *Trademark Infringement*

To prevail on a claim of trademark infringement, a plaintiff must show that she "has a valid mark entitled to protection under the Lanham Act" and that defendant's use of that mark is likely to cause confusion. *1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 407 (2d Cir. 2005). Defendant argues that Plaintiff's claim must fail because she cannot establish as a matter of law that she has a valid mark and because she has failed to present a genuine issue of material fact as to the likelihood of confusion. Because the Court agrees that based on the present record, there are no genuine issues of material fact as to the likelihood of confusion, Defendant's motion is granted.

**A.**     *Validity of Plaintiff's Mark*

**1.**     *Classification of a Mark Generally*

The validity of a mark, to a certain extent, depends upon its position along the so-called spectrum of distinctiveness.  Courts classify a mark in one of four categories in ascending order of inherent distinctiveness: generic, descriptive, suggestive, and arbitrary.  *See Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 384-85 (2d Cir. 2005); *see also Brennan's Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 131 (2d Cir. 2004).  The different categories of inherent distinctiveness have been described as follows:

> A generic term refers . . . to the genus of which the particular product is a species, e.g., "Encyclopedia," and is not entitled to trademark registration or legal protection. A descriptive mark is one which conveys an immediate idea of the ingredients, qualities or characteristics of the goods, e.g., "World Book" for an encyclopedia.  A suggestive mark is one that require[s] imagination, thought and perception to reach a conclusion as to the nature of the goods, e.g., Coppertone for suntan oil.  An arbitrary or fanciful mark is one that has no association with the particular product or service, e.g., "Kodak" for photographic equipment.

*Windsor, Inc. v. Intravco Travel Ctrs., Inc.*, 799 F. Supp 1513, 1522 (S.D.N.Y. 1992) (internal quotation marks and citations omitted).

**a.**     *Generic Marks*

Generic marks consist of "words identifying the relevant category of goods or services."  *Star Indus.*, 412 F.3d at 385; *see also Playtex Prods., Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 163 (2d Cir. 2004) ("[G]eneric marks [are] those consisting of words that identify the type or species of goods or services to which they apply, and that are totally lacking in distinctive quality.") (citation and internal quotation marks omitted).  In other words, "a mark is generic if, in the mind of the purchasing public it does not distinguish products on the basis of

source but rather refers to the type of product," *Courtenay Commc'ns. Corp. v. Hall*, 334 F.3d 210, 214 n.2 (2d Cir. 2003), e.g., "Magazine" as a magazine title, *Time, Inc. v. Petersen Pub. Co. L.L.C.*, 173 F.3d 113, 118 (2d Cir. 1999). Generic marks "are not at all distinctive and thus are not protectable under any circumstances." *Star Indus.*, 412 F.3d at 385; *see also TCPIP Holding Co., Inc. v. Haar Commc'ns., Inc.*, 244 F.3d 88, 93 (2d Cir. 2001) ("[Generic marks] are not entitled to any protection against infringement, even if they have become famous as marks, because according such protection would deprive competitors of the right to refer to their goods by name.").[2]

        Generic terms are not limited to nouns that directly name a product; instead, they may also be adjectives which name some distinctive characteristic of a genus of products. *See* 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 12:10 at 12-24 (4th ed 2006) (hereinafter referred to as *McCarthy on Trademarks*); *see also Horizon Mills Corp. v. QVC, Inc.*, 161 F. Supp. 2d 208, 213 (S.D.N.Y. 2001). For example, the Seventh Circuit found "Light Beer" and "Lite Beer" to be generic names for a type of beer light in body or taste or low in alcoholic or caloric content. *See Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75, 79-81 (7th Cir. 1977). Another example of an adjective found to be generic is "matchbox" for a type of toy car. *See J. Kohnstam, Ltd. v. Louis Marx & Co.*, 280 F.2d 437 (C.C.P.A. 1960). In this regard, "[t]he Trademark Board has said that a term which does not directly name a product but names the most important purpose of the product is a type of 'generic adjective'

_____

[2] It is well established that a word may be generic of some things but not of others. *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 147 (2d Cir. 1997). "To take a familiar example, 'Ivory' would be generic when used to describe a product made from the tusks of elephants but arbitrary as applied to soap." *Id.* (citation and internal quotation marks omitted).

which is a generic name." *McCarthy on Trademarks* § 12:10 at 12-24.

> **b.** *Descriptive Marks*

"Descriptive marks are those consisting of words identifying qualities of the product." *Id.* "A mark is descriptive if it describes the product's features, qualities, or ingredients in ordinary language or describes the use to which the product is put." *Lane Capital Mgm't, Inc. v. Lane Capital Mgm't, Inc.*, 192 F.3d 337, 344 (2d Cir. 1999); *see also Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 404 n.7 (6th Cir. 2002) ("A 'merely descriptive' mark, as opposed to a 'common descriptive' [generic] one, is often said to identify a characteristic of the thing. It is very similar to an adjective."); *Horizon Mills Corp.,* 161 F. Supp. 2d at 212 ("Descriptive terms are those that describe a thing, or 'how it is,' rather than name that thing, or 'what it is.'") (citation omitted).

Descriptive marks are not inherently distinctive, but are protectable when they acquire "secondary meaning," *Star Indus.*, 412 F.2d at 385, i.e., they identify the source of the product rather than the product itself, *Bristol-Myers Squibb Co.* v. *McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1041 (2d Cir. 1992); *see also Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 762 n.9 (3d Cir. 2005) ("To acquire a secondary meaning in the minds of the buying public, an article of merchandise when shown to a prospective customer must prompt the affirmation, 'That is the article I want because I know its source,' and not the negative inquiry as to 'Who makes that article?'") (quoting *Esercizio v. Roberts,* 944 F.2d 1235, 1239 (6th Cir. 1991)).

> **c.** *Suggestive Marks*

Suggestive marks are inherently distinctive. *Star Indus.*, 412 F.3d at 385; *see also TCPIP Holding*, 244 F.3d at 94 ("Marks that do not directly describe goods or services or their

attributes, but rather are suggestive of them, have some distinctive quality and are thus protected without need to prove secondary meaning."). "Suggestive marks are those that are not directly descriptive, but do suggest a quality or qualities of the product, through the use of imagination, thought and perception." *Star Indus.*, 412 F.3d at 385 (citation and internal quotations marks omitted); *see also Streetwise Maps, Inc. v. VanDam, Inc.,* 159 F.3d 739, 744 (2d Cir. 1998) ("The district court ranked the Streetwise mark as suggestive, meaning that the term 'suggested' the features of the product [i.e., a map] and required the purchaser to use his or her imagination to figure out the nature of the product. We agree.").

### d.      *Arbitrary and Fanciful Marks*

"Arbitrary or fanciful marks are ones that do not communicate any information about the product either directly or by suggestion." *Star Indus.*, 412 F.3d at 385. Arbitrary means that the ordinary meaning of the word is applied in an arbitrary and non-descriptive sense. *McCarthy on Trademarks* § 11:11 at 11-18. For example, "IVORY" soap is not made of ivory. *See id.* "A fanciful mark is a name that is made-up to identify the trademark owner's product like EXXON for oil products and KODAK for photography products." *Gruner + Jahr*, 991 F.2d at 1075-76. Both arbitrary and fanciful terms are always entitled to trademark protection. *Id.* at 1075.

### 2.      *Classification of Plaintiff's Mark*

### a.      *Presumption of Validity*

As a preliminary matter, the Court notes that the fact that the USPTO accepted Plaintiff's mark for registration creates a presumption that the mark is valid. *See Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 114 (2d Cir. 2001) (citing 15 U.S.C. § 1057(b) ("A

certificate of registration of a mark upon the principal register provided by this chapter shall be prima facie evidence of the validity of the registered mark . . . .")); *see also Lane Capital Mgm't,* 192 F.3d at 345 ("Registration by the PTO without proof of secondary meaning creates the presumption that the mark is more than merely descriptive, and, thus, that the mark is inherently distinctive. As a result, when a plaintiff sues for infringement of its registered mark, the defendant bears the burden to rebut the presumption of mark's protectability by a preponderance of the evidence.") (citation omitted).

On this summary judgment motion, Defendant argues that Plaintiff's "American Dream" mark is invalid because it is merely generic. Alternatively, Defendant asserts that Plaintiff's mark is descriptive but lacks secondary meaning. The Court must presume Plaintiff's mark is valid because it has been federally registered since 2003. Such registration constitutes prima facie evidence of Plaintiff's right to use the name "American Dream" to refer to its talk show dealing with people's lives. (Def.'s Ex. CC.) The burden of production therefore shifts to Defendant to proffer evidence that the mark is not valid, i.e., that it is generic or descriptive with no secondary meaning. For the reasons stated below, the Court finds that Defendant has failed to do so.[3]

**b.** ***Plaintiff's "American Dream" Mark is Not Generic***

"The classification of a mark is a factual question [which turns on] how the purchasing public views the mark." *Lane Capital Mgm't,* 192 F.3d at 344; *see also Courtenay,*

---

[3] Neither party addresses whether the presumption begins at the time Plaintiff filed her application for registration, June 29, 2002, or on the date of registration, March 25, 2003. NBC's alleged infringing conduct began in May 2002 and presumably continues today via syndication and DVD rentals/sales. In either case, the applicable date does not affect the Court's conclusion that Plaintiff's mark is suggestive.

334 F.3d at 215. Nonetheless, summary judgment is as appropriate in trademark cases as any other where there are no material disputes of fact. *See Ideal World Mktg., Inc. v. Duracell, Inc.*, 15 F. Supp. 2d 239, 242-43 (E.D.N.Y. 1998) (citing *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 478 (2d Cir. 1996).[4]

Guided by the foregoing authority, the Court concludes that Plaintiff's mark "American Dream" is not generic. A generic mark is entitled to no protection because to do so would "deprive competing manufactures of the product of the right to call an article by its name." *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976). Here, these concerns are not implicated as "American Dream" is not a generic designation for a television show. In fact, the mark "American Dream" makes no reference whatsoever to the nature of the goods it designates. Simply put, the phrase, without more, does not imply a television talk show dealing with people's lives. *See Playtex Prods., Inc.*, 390 F.3d at 164 (holding that "Wet Ones" is suggestive and stating: "Wet Ones, like Wite-Out, could plausibly describe a wide variety of products."); *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 144 (2d Cir. 1997) ("In order to become generic the *principal* significance of the word must be its indication of the nature or class of an article, rather than an indication of its origin.") (citation and internal quotations marks omitted); *cf. Reese Publ'g. Co. v. Hampton Int'l Commc'ns., Inc.*, 620 F.2d 7 (2d Cir. 1980) (finding "Video Buyers Guide" to be generic).

---

[4] As stated by Defendant, "the case law is replete with cases determining on summary judgment each of the grounds for dismissal at issue here: (1) genericness, (2) lack of secondary meaning, and (3) lack of likelihood of confusion." (Def.'s Reply at 2 (citations omitted).)

### c.     *Plaintiff's "American Dream" Mark is Suggestive*

Having found that the mark is not generic, the next question becomes whether the term "American Dream" is descriptive or suggestive of the television show.[5]  Neither party addresses this issue.  Defendant's brief presumes that the term is either generic or descriptive (with no secondary meaning) and thus not entitled to any protection.  Plaintiff merely proclaims that her mark is "distinctive" and relies almost entirely on her trademark registration by the USPTO to support her claim.  Other than emphasizing registration, Plaintiff's 12-page brief is a mere recitation of a singular theme -- that classification of her mark is a question of fact.  But this oft-repeated mantra, absent any in depth analysis or citation to relevant case law, does not assist the Court in making its determination.

The descriptive-suggestive distinction is "hardly a clear one."  *McCarthy on Trademarks* § 11:66 at 11-127.  The Second Circuit has articulated the following guidelines to assist courts in making this distinction:

> A term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of goods. . . .  A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods.
>
> . . . .
>
> An illuminating explanation of the difference between a descriptive mark that conveys an idea of the characteristics of the product and a suggestive one that requires imagination to divine the nature of the product is that if there is an imaginative factor connecting the name and the product; [if] one suggests the other, but without describing it, then the name is suggestive.

---

[5]  Clearly the mark is not arbitrary or fanciful and neither party argues as much.

13

*Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 73-74 (2d Cir. 1988) (citations and internal

quotation marks omitted); *see also Bernard v. Commerce Drug Co.*, 964 F.2d 1338, 1341 (2d

Cir. 1992) (same); *McCarthy on Trademarks* § 11:19 at 11-30 ("To be characterized as

'descriptive,' a term must directly give some reasonably accurate or tolerably distinct knowledge

of the characteristics of a product.  If information about this product or service given by the term

used as a mark is indirect or vague, then this indicates that the term is being used in a

'suggestive,' not descriptive, manner.").

   Applying these principles to the case at bar, the Court concludes that "American

Dream" is suggestive in that a consumer would not immediately connect "American Dream"

with "a Talk Show about People, their Heritage, Goals, Struggles and Dreams."  *See*

www.americandream.com; *see also McCarthy on Trademarks* § 11:67 at 11-129-11-130 ("If the

mental leap between the word and the product's attributes is not almost instantaneous, this

strongly indicates suggestiveness, not direct descriptiveness.").  In urging the Court that the term

is merely descriptive, Defendant submits multiple dictionary definitions of "American Dream"

which it claims supports its view that the public's perception of the term is uniform.  (Def.'s Ex.

S.)  Examples include: (1) "an American ideal of a happy and successful life to which all may

aspire" (The American Heritage Dictionary of the English Language 15 (4th ed. 2000)); (2) "an

American social ideal that stresses egalitarianism and esp. material prosperity" (Merriam-

Webster's Collegiate Dictionary 37 (10th ed. 1994)); (3) "the traditional social ideals of the

United States, such as equality, democracy, and material prosperity" (The New Oxford American

Dictionary 50 (2001)); (4) "the ideals of freedom, equality, and opportunity traditionally held to

be available to every American" (Webster's Encyclopedic Unabridged Dictionary of the English

Language 66 (1996)).

In the Court's view, these definitions are not sufficiently consistent so as to suggest that an ordinary consumer confronted with the term "American Dream" would immediately sense the identical thing, much less perceive the characteristics of Plaintiff's show. In fact, one of the very definitions proffered by Defendant demonstrates the term's ambiguity: "[t]he American dream *is almost impossible to define, meaning as it does so many different things to so many different people*. These words go back at least to de Tocqueville's *Democracy in America* (1835) and are usually associated with the dreams of people new to these shores of freedom, material prosperity, and hope for the future." (The Facts on File Encyclopedia of Word and Phrase Origins (1987) at 15 (attached as Def.'s Ex. S) (emphasis added).)

This conclusion is further borne out by Defendant's proffer regarding the multitude of motion pictures, books, television shows, and other services and goods which have used "American dream" in their titles. Although Defendant argues that these works demonstrate that "[t]here is a longstanding and expansive genre of works about the broad American social ideal of success known as the 'American dream'" (Def.'s Mem. at 8), a review of the few descriptions offered reveals the great divergence among the works' contents. For example, one television show entitled "AMERICAN DREAM" that aired in 1981 is described as "a contemporary drama about a family who leaves the suburbs and undergoes a cultural shock when they move into a Chicago neighborhood." (Def.'s Ex. Y ("Title Report") at 3.) Another work is labeled a "[t]elefeature" which aired in 1981 about "members of a young midwestern family who leap onto an adventure that changes their lives." (*Id.*) Yet another is a motion picture entitled "AMERICAN DREAM" produced in 1996 about "a sensation-seeking televison reporter, who

15

has been needling police about their connections with [the] underworld [and] accidentally murders his estranged wife and now finds not only the underworld wanting him dead, but the police try to get him on a murder charge." (*Id.* at 2.)

Even assuming arguendo that the term "American Dream" conjured up general, and even somewhat related, ideals in the minds of an average consumer pertaining to success in America, the term does not sufficiently describe the "particular [show] itself or its differentiating qualities." *See Hasbro*, 858 F.2d at 75 (finding that term "GUNG-HO" was suggestive rather than descriptive of a toy action figure of a marine sergeant because "a certain amount of creative imagination is required" of the child to intuit the specific attributes of this particular character from its mark.); *see also Twin Peaks Prods., Inc. v. Publ'ns Int'l Ltd.*, 996 F.2d 1366, 1379 n.4 (2d Cir. 1993) ("The TWIN PEAKS mark is at least suggestive and not merely descriptive. TWIN PEAKS neither literally describes the television program nor describes the purpose or utility of the product."); *Playboy Enters., Inc. v. Chuckleberry Publ'g, Inc.*, 687 F.2d 563, 566-67 (2d Cir. 1982) (holding that term "PLAYBOY" was suggestive; although term "may signify the aspirations of PLAYBOY's readership, it does not describe the product or its contents"). Rather, connecting general ideals of prosperity to a talk show where guests are invited to talk about "family heritage, struggles, goals, dreams and accomplishments" (Def.'s Ex. A) requires some imagination and "it is this need to resort to imagination that renders ["American Dream"] suggestive rather than descriptive." *Hasbro*, 858 F.2d at 75. Thus, based on the undisputed facts before the Court, the Court holds that "American Dream" as used by Plaintiff in relation to her

television show is a suggestive mark.[6]

### III.     *Likelihood of Confusion*

#### A.     *Literary Titles*

Having decided that Plaintiff's mark is suggestive, it would ordinarily follow that it is protectable without proof of secondary meaning.  *See Hasbro*, 858 F.2d at 75.  However, "[b]ecause of an author's significant First Amendment interest in choosing an appropriate title for his or her work," the Second Circuit has applied a more stringent rule to literary titles, such as the name of Plaintiff's television show.  *Twin Peaks Prods.*, 996 F.3d at 1379.  While the Second Circuit has not yet decided whether a showing of secondary meaning is required for literary titles, *id.*, it has held that "literary titles do not violate the Lanham Act 'unless the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work.'"  *Id.* (quoting *Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir. 1989)).

Here, neither party has suggested that "American Dreams" is of no relevance to Defendant's show.  The question then is whether the title "explicitly misleads as to the source or content of the work."  *Id.*  This determination is made, in the first instance, by application of "the venerable *Polaroid* factors."  *Id.* (referencing *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961)).  However, "the finding of likelihood of confusion must be particularly compelling to outweigh [Defendant's significant] First Amendment interest."  *Id.*; *see also*

---

[6] Because, as discussed *infra*, the Court finds that a reasonable trier of fact could not find for Plaintiff on the likelihood of confusion element, the Court grants Defendant's motion for summary judgment despite the Court's finding that Plaintiff's mark is suggestive and thus, *potentially*, entitled to protection.

*Rogers*, 875 F.3d at 999 ("The [Lanham] Act should be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression."). Accordingly, the Court turns to the critical inquiry in this case: whether Defendant's use of "American Dreams" is likely to cause confusion.

**B.      *The Polaroid Factors***

"To support a finding of infringement, a *probability* of confusion, not a mere possibility, must exist." *Id.* (emphasis added); *see also Playtex Prods., Inc.*, 390 F.3d at 161. A probability of confusion "may be found when a large number of purchasers likely will be confused as to the source of the goods in question." *Streetwise Maps, Inc.*, 159 F.3d at 743. In determining whether or not there is a likelihood of confusion, courts in the Second Circuit apply the eight factors set forth by Judge Friendly in the *Polaroid* decision:

> (1) the strength of plaintiff's mark; (2) the similarity of the parties' marks; (3) the proximity of the parties' products in the marketplace; (4) the likelihood that the plaintiff will "bridge the gap" between the products; (5) actual consumer confusion between the two marks; (6) the defendant's intent in adopting its mark; (7) the quality of the defendant's product; and (8) the sophistication of the relevant consumer group.

*Playtex Prods., Inc.*, 390 F.3d at 162 (quoting *Polaroid*, 287 F.2d at 495)).

"Where the predicate facts are beyond dispute, the proper balancing of these factors is considered a question of law." *Id.* (citing *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000)). In general, no single factor should be treated as dispositive. *Id.* Furthermore, the evaluation of the *Polaroid* factors is not "a mechanical process by which the party with the greatest number of factors wins." *Id.* "Instead, the court 'should focus on the ultimate question of whether consumers are likely to be confused.'" *Id.* (quoting *Nabisco, Inc.*,

220 F.3d at 46).

### 1.  *The Strength of the Mark*

The strength of a mark refers to its distinctiveness, i.e., its tendency to identify goods sold under the mark as emanating from one particular source.  *See Streetwise Maps*, 159 F.3d at 743; *Brennan's, Inc.*, 360 F.3d at 130.  To determine a mark's strength, courts consider two factors: its inherent distinctiveness and its distinctiveness in the marketplace.  *See Streetwise Maps*, 159 F.3d at 743; *Brennan's, Inc.*, 360 F.3d at 130-31.

"[I]nherent distinctiveness[] examines a mark's theoretical potential to identify plaintiff's goods or services without regard to whether it has actually done so."  *Id.* at 131.  As discussed above, courts classify a mark in one of four categories in ascending order of inherent distinctiveness: generic, descriptive, suggestive, and arbitrary.  *See Streetwise Maps*, 159 F.3d at 744; *Brennan's, Inc.*, 360 F.3d at 131.  Here, the Court has already found that Plaintiff's mark is suggestive and therefore falls into the second highest ranking category of distinctiveness.  Accordingly, the Court proceeds to consider Plaintiff's mark's distinctiveness in the marketplace.  *See Streetwise Maps*, 159 F.3d at 744 ("Suggestiveness, however, does not necessarily determine the issue regarding the strength of the mark.  [The Court] must still consider the mark's distinctiveness in the marketplace.").

Distinctiveness in the marketplace "looks solely to that recognition plaintiff's mark has earned in the marketplace as a designator of plaintiff's goods or services."  *Brennan's Inc.*, 360 F.3d at 131.  Here, other than conclusory assertions that she has expended "considerable sums on advertising to promote [her] show" and that, as a result, her "show and the marks associated with it have become distinctive and distinguish [her] and [her] show from

other businesses and TV shows" (Pl.'s Aff. ¶ 4), Plaintiff has presented no evidence that the

public has come to identify "American Dream" with her show. Defendant, on the other hand,

has proffered evidence which demonstrates extensive third-party use of the term "American

dream," thereby suggesting that the mark is not particularly distinctive in the marketplace.[7] *See*

*Streetwise Maps*, 159 F.3d at 744 (finding mark weakened by extensive use of the words "street"

and "wise" in names registered by manufacturers of other products); *Lang v. Ret. Living Pub.*

*Co., Inc.*, 949 F.2d 576, 581 (2d Cir. 1991) ("[E]xtensive third party use of the words 'Choice'

and 'Choices' weighs against a finding that Lang's trade name is strong.").

In the absence of any evidence that Plaintiff's mark is distinctive in the

marketplace, and in the face of Defendant's evidence that the term "American dream" is

commonly used in the marketplace, the Court finds that although Plaintiff's mark is ranked as

suggestive for its inherent distinctiveness, it is not strong. Accordingly, this factor favors

Defendant.

### 2. *The Similarity of the two Marks*

"In determining whether the two marks are similar, and therefore likely to

provoke confusion among prospective purchasers, courts appraise 'the overall impression

created by the logos and the context in which they are found and consider the totality of factors

that could cause confusion among prospective purchasers.'" *Streetwise Maps*, 159 F.2d at 744

(quoting *Gruner + Jahr*, 991 F.2d at 1078). "Each mark must be compared against the other as a

---

[7] For example, Defendant's title availability search revealed that over a dozen motion
pictures, 50 books, 250 musical compositions, dozens of plays, stories and articles, and countless
other services and goods have the term "American dream" in their titles. (Def.'s Ex. M.) In
addition, Amazon.com lists more than 1,000 books with titles incorporating the term. (Def.'s
Ex. AA.)

whole." *Brennan's Inc.*, 360 F.3d at 133; *see also I.T.S. Industria Tessuti Speciali v. Aerfab Corp.*, 280 F. Supp. 581, 588 (S.D.N.Y. 1967) ("It is well settled that marks cannot be dissected for purposes of comparison but must be considered in their entirety."). Moreover, "[t]he fact that the two marks appear similar is not dispositive. Rather, the question is whether such similarity is more likely than not to cause consumer confusion." *Id.*

Here, Defendant's title consists of "American" in red letters above "Dreams" in white letters, using a rounded font. Plaintiff's show uses a logo with "AMERICAN DREAM" spelled out in all capitals, red letters, with a blue star between the two words, and the words "TV SHOW" directly below, using an angular font. Among the most important differences is the fact that Defendant's program has only been shown and advertised with its distinguishing NBC logo in the bottom right corner of the screen. The Second Circuit has "repeatedly found that the presence of a distinct brand name may weigh against a finding of confusingly similarity." *Playtex Prod.*, 390 F.3d at 164 (collecting cases); *see also Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 123 (2d Cir. 2001) ("Based on the record before us, we find that the presence of the prominent and distinctive labels alone negates any possibility of a likelihood of confusion . . . ."); *Nabisco, Inc.*, 220 F.3d at 46 ("Warner-Lambert's prominent use of its well-known house brand therefore significantly reduces, if not altogether eliminates, the likelihood that consumers will be confused as to the source of the parties' products.").

In Plaintiff's show's introduction, the title shares billing with Plaintiff's name ("American Dream TV Show with Ingrid Lemme"), the name of the show's setting ("Gurney's Inn") above it, the name of the cable network on which it airs ("WVVH") in the upper right hand corner, and an American flag waving in the background. Moreover, the "WVVH" logo remains

on the screen throughout the broadcast.

Given the use of different colors and typefaces, the prominent display of "NBC" with Defendant's title, and Defendant's show national distribution versus Plaintiff's local cable distribution, the Court finds that this factor favors Defendant; the marks are not so similar as to create confusion among prospective viewers.

### 3. *The Proximity of the Parties' Products in the Marketplace*

This factor focuses on whether the two products compete with each other. *See Streetwise Maps*, 159 F.2d at 745. As recently articulated by the Second Circuit:

> The competitive proximity factor has two elements, market proximity and geographic proximity. Market proximity asks whether the two products are in related areas of commerce and geographic proximity looks to the geographic separation of the products. Both elements seek to determine whether the two products have an overlapping client base that creates a potential for confusion.

*Brennan's*, 360 F.3d at 134. Other than her assertions as to the local television market on which her show is broadcast, and her claim that her program may be seen on the world-wide web, Plaintiff offers no evidence on this point.[8]

Without more information, the Court finds that this factor favors Defendant. A review of the record reveals that although both parties produce television programs, their shows are quite different from one another, both in substance and theme. Moreover, Plaintiff's show is broadcast locally and reaches thousands of viewers while NBC's show was broadcast nationally and reached millions of viewers. Given the differences between the two shows, their

---

[8] Plaintiff submits an article which she states is "from Germany in 2000 discussing the success of [her] show." (Pl.'s Aff. ¶ 2.) Because the article is written in German and Plaintiff offers no translation, the Court declines to consider it.

"geographic separation," and the absence of any evidence demonstrating "an overlapping client base that creates a potential for confusion," the Court finds that this factor fails to give rise to a question of fact regarding the likelihood of consumer confusion.[9]

### 4. *The Likelihood that Plaintiff will "Bridge the Gap"*

The question under this factor is the likelihood that Plaintiff will enter Defendant's market. *W.W.W. Pharmaceutical v. Gillette Co.*, 984 F.2d 567, 574 (2d Cir. 1993), *superceded on other grounds*, *Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39 (2d Cir. 1994). "This factor is designed to protect the senior user's 'interest in being able to enter a related field at some future time. . . ." *Id.* (quoting *Scarves by Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167, 1172 (2d Cir. 1976)).

In her affidavit, Plaintiff asserts that "[a]s [her] show gained acceptance and market share [she] began to receive interest about taking it to a national level." (Pl.'s Aff. ¶ 6.) Consequently, she submitted a "business plan and budget . . . to various networks, including A&E, PBS, and TBS." (*Id.* ¶ 7.) According to Plaintiff, her "proposal was received enthusiastically and [she] began negotiations with several parties to expand and syndicate [her] show." (*Id.* ¶ 9.) "After NBC aired its show, all negotiations to develop [her] show with other parties ceased." (*Id.*) Plaintiff submits a signed unsworn letter from the President and General Manager of WVVH television who states that "after NBC began to air its American Dream show, the potential of [Plaintiff's] show was greatly diminished due to confusion with the arrival

---

[9] Although there is some geographic overlap between the two shows as NBC's show was distributed nationally and thus encompassed the area where Plaintiff's show is broadcast, the overlap is minimal. Moreover, there has been no showing that there was an overlap in client base that created a potential for confusion.

of the NBC's show with the same name."  (Ex. to Pl.'s Aff.)  She also submits the signed

unsworn statement of the producer of her show to the same effect.  (*Id.*)

Viewing Plaintiff's affidavit favorably,[10] it presents some evidence that Plaintiff

was intending to bridge the gap between her locally viewed show and Defendant's nationally

broadcast show.  However, she has presented no evidence that she planned on bridging the gap

with respect to the very different nature of the parties' programming.  Nonetheless, the Court

finds that this factor weighs at most weakly in favor of a finding of confusion.

### 5.    *Actual Consumer Confusion Between the Two Marks*

"It is self-evident that the existence of actual consumer confusion indicates a

likelihood of consumer confusion."  *Virgin Enters. Ltd. v. Nawas*, 335 F.3d 141, 151 (2d Cir.

2003).  It is well established, however, that a plaintiff seeking to prevail under the Lanham Act

need not prove the existence of actual confusion, "since actual confusion is very difficult to

prove and the Act requires only a likelihood of confusion."  *Lois Sportswear, U.S.A., Inc. v. Levi

Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986).

In support of her claim of actual confusion, Plaintiff submits copies of three e-

mails she allegedly received.  One e-mail is from a "Mary Hughes" who writes "They are using

your trade marked name call your lawyer."  (Ex. to Pl.'s Aff.)  The next e-mail is from a "Roy

Bradbrook" who writes: "Ingrid, saw the other American dream show[.] I am not a lawyer –

---

[10]  Because both the letter and statement proffered by Plaintiff are unsworn, they are inadmissible and thus may not be considered by the Court.  *See United States v. All Right,Title & Interest in Real Prop. & Appurtenances*, 77 F.3d 648, 657-58 (2d Cir. 1996) ("The submission of [an] unsworn letter was an inappropriate response to the . . . motion for summary judgment, and the factual assertions made in that letter were properly disregarded by the court.").  In any event, even were the Court to consider these submissions, the result would be the same.

these names are trademarked by you, surely you have a legal right to get them to stop using the names or [] to receive damages for infringement.  Big corporations should not be above the law." (*Id.*)

> The final e-mail is from ["MidnightPassInc@aol.com"](mailto:MidnightPassInc@aol.com)  who writes:
>
> I am looking forward to our May show date showing American Flag Hammocks. . . . <u>Also, please clarify this for me.  I understand that your show is American Dream and I saw a show last week called American Dreams on NBC.  I am confused. . ?  Who are they and who are you?  I thought you were the originator of this type of program</u>?  I might suggest that you check the Patent and Trademark Office a . . . and verify if NBC is infringing on your established and registered trademark. . . .

(*Id.* (emphasis in original).

> To the extent these e-mails demonstrate that the authors knew of the existence of NBC's show as separate and distinct from Plaintiff's show, they evidence consumer knowledge, not confusion.  *See Nora Beverages*, 269 F.3d at 124 ("Inquiries about the relationship between an owner of a mark and an alleged infringer do not amount to actual confusion. Indeed, such inquiries are arguably premised upon a *lack* of confusion between the products such as to inspire the inquiry itself.").  Moreover, insofar as the last e-mail suggests that the author is confused, this one instance, standing alone, is insufficient to create a genuine issue of material fact as to the likelihood of confusion.   *See id.* ("[T]wo anecdotes of confusion over the entire course of competition constituted *de minimis* evidence insufficient to raise triable issues.").  Accordingly, the absence of proof of any actual confusion, although not dispositive, is a factor favoring Defendant.  *See Windsor, Inc.*, 799 F. Supp. at 1524 ("Although no evidence of actual confusion is necessary to prove a likelihood of confusion, the court may infer from the lack of such evidence that consumer confusion is unlikely to occur.").

### 6.    *Defendant's Intent in Adopting its Mark*

This factor examines whether defendant "adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between [defendant's] and [plaintiff's] product." *Lang*, 949 F.2d at 583; *see also Streetwise Maps*, 159 F.3d at 745. Plaintiff argues that the Court may infer Defendant's bad faith based on the fact that both the date accepted by the USPTO as Plaintiff's first use of the term "AMERICAN DREAM," viz. December 1997, and the date Plaintiff filed its application for registration with the USPTO, viz. July 29, 2002, precede NBC's launching of its "American Dreams" program. Plaintiff is mistaken.

As an initial matter, the Court notes that prior knowledge of Plaintiff's mark, without more, does not create an inference of bad faith. *See Playtex Prods., Inc.*, 390 F.3d at 166; *cf. Lang*, 949 F.2d at 584 ("[A]doption of a trademark with actual knowledge of another's prior registration of a very similar mark may be consistent with good faith."). In any event, the undisputable evidence reveals that NBC conducted its title search and began using its title in May 2002, prior to Plaintiff's filing for registration in July 2002, and prior to actual registration, which occurred in 2003. Thus, NBC could not have had notice of Plaintiff's registration, or of her filing, prior to its use of the title "American Dreams" because its use preceded both dates. Further, there is no evidence to even suggest that NBC was aware of Plaintiff's show at all prior to launching its own program. In fact, NBC contends otherwise.

"Good faith can be found if a defendant has selected a mark which reflects the product's characteristics, has requested a trademark search or has relied on the advice of counsel." *See W.W.W. Pharmaceutical Co.*, 984 F.3d at 575. Given the extensive title and

trademark search conducted by NBC prior to using its title, the fact that the title of NBC's

program reflects certain characteristics of the show, and the failure of Plaintiff to elicit any facts

which would suggest Defendant's bad faith, the Court finds that this factor favors Defendant.

### 7.     *The Quality of Defendant's Product*

"'This factor is primarily concerned with whether the senior user's reputation

could be jeopardized by virtue of the fact that the junior user's product is of inferior quality."

*The Sports Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 965 (2d Cir. 1996) (quoting

*Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 398 (2d Cir. 1995)).  Plaintiff does not

dispute that NBC's nationally broadcast show "is vastly superior in quality" to Plaintiff's local

talk show.  Therefore, this factor clearly favors Defendant.

### 8.     *The Sophistication of the Relevant Consumer Group*

Generally, the more sophisticated a consumer, the more attention and care given

to selecting a product; thus, unsophisticated buyers are more likely to be confused and

sophisticated buyers are less likely to be so.  *See, e.g.*, *W.W.W. Pharmaceutical,* 984 F.2d at 575-

76; *WE Media, Inc. v. General Elec. Co.*, 218 F. Supp. 2d 463, 479 (S.D.N.Y. 2002).  There is no

evidence in the record as to the sophistication of either programs' viewers.  Thus, this factor does

not show that there is a likelihood of confusion between the marks at issue.[11]

---

[11]  Given the stark differences between the two programs, even an ordinary consumer is
unlikely to be confused.  *See Motown Prods., Inc. v. Cacomm, Inc.*, 668 F. Supp. 285, 291-92
(S.D.N.Y. 1987) ("The two programs, however, are so different in content and quality tha[t]
there is no likelihood of confusion even among ordinary television viewers. No significant
number of viewers could confuse the $10 million Motown production, featuring a well-known
comedian as host, a band under the direction of a prominent popular musician, and a variety of
entertainment, with Cacomm's $54,000 series, consisting solely of one-camera, 'talking heads'
interviews conducted by two unknowns."), *rev'd on other grounds*, 849 F.2d 781 (2d Cir. 1988).

### C.  Balancing the Factors

Having carefully considered and weighed the eight *Polaroid* factors as well as the arguments and submissions of the parties, the Court determines as a matter of law that Plaintiff has failed to offer evidence that creates a material question of fact as to the likelihood of consumer confusion with respect to the parties' marks.  No rational trier of fact could find for Plaintiff after an evaluation of the *Polaroid* factors.  This is especially so in this case where the finding of likelihood of confusion must be "particularly compelling" to outweigh NBC's significant First Amendment interest in the title of its program.  Accordingly, Defendant's motion for summary judgment is granted.

### IV.  Plaintiff's Remaining Claims are Dismissed

The remaining claims in this case arise under state law.  Having found that the allegations in the Complaint do not support federal jurisdiction, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims.  *See* 28 U.S.C. § 1367(c)(3). Accordingly, all state law claims are dismissed without prejudice to refiling in state court.

### CONCLUSION

For all of the above reasons, Defendant's motion for summary judgment is GRANTED as to all of Plaintiff's claims, and this case is accordingly DISMISSED in its entirety.  The Clerk of Court is directed to CLOSE this case.

**SO ORDERED.**

Dated: February 1, 2007
      Central Islip, New York          /s_____
                                       Denis R. Hurley,
                                       United States District Judge